**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 09-cr-00410-CMA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**HOWARD KIEFFER,**

**Defendant.**

_____

**REPORTER'S TRANSCRIPT**
**(Continued Sentencing Hearing)**
_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 8:31 a.m. on the 16th
day of August, 2010, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
STEWART C. WALZ, U.S. Attorney's Office - Salt Lake City,
185 S. State St., Suite 300, Salt Lake City, UT 84111

**FOR THE DEFENDANT:**
NATHAN D. CHAMBERS, Chambers Dansky & Mulvahill, LLC, 1601
Blake St., Suite 300, Denver, CO 80202

## I N D E X

**WITNESSES:**                                                                              **PAGE**

**SPECIAL AGENT TODD WILCOX**
DIRECT EXAMINATION BY MR. WALZ                                              36

## E X H I B I T S

**NO.**                                                                                  **ADMITTED**

1-3    ........................................    38


**No.**                                                                                   **REFUSED**

........................................

1                          **AUGUST 16, 2010**

2          (Proceedings commence at 8:31 a.m.)

3          THE COURT:  You may be seated.

4          Court calls Criminal Case No. 09-cr-000410,

5    entitled United States of America v. Howard Kieffer.

6          Counsel, would you enter your appearances.

7          MR. WALZ:  Stewart Walz on behalf of the United

8    States, Your Honor.  With me at counsel table is FBI

9    Special Agent Todd Wilcox.

10         THE COURT:  Good morning.

11         MR. CHAMBERS:  Good morning, Your Honor, Nathan

12   Chambers appearing for Howard Kieffer.  He is present in

13   custody.

14         THE COURT:  Good morning.

15         All right.  For the record, the Court also notes

16   Ms. Justine Kozak, representing the United States

17   Probation Office, is in attendance at this hearing.

18         Good morning, Ms. Kozak.

19         PROBATION OFFICER:  Good morning, Your Honor.

20         THE COURT:  All right.  Mr. Chambers, would you and

21   Mr. Kieffer please approach the lectern.

22         Mr. Kieffer, the record shows that on February 10,

23   2010, you were charged by Superseding Indictment as a

24   defendant with one count of wire fraud in violation of 18

25   United States Code Section 1343 and 2(b).  You were also

1    charged with making a false statement to a clerk of the

2    United States District Court for the District of Colorado

3    in violation of 18 United States Code Section 1001.  And

4    you were charged with contempt in violation of 18 United

5    States Code Section 401(a) and (3).

6          The record also shows that after a full jury trial

7    on April 9, 2010, you were found guilty of and were

8    convicted of all three of those counts; is that correct?

9          THE DEFENDANT:  Yes.

10          THE COURT:  All right.  We are here this morning

11   for sentencing.

12          Counsel, I have received and reviewed the full

13   presentence investigation report dated May 24, 2010,

14   including all addenda and attachments thereto.

15          I have reviewed Document No. 85, the defendant's

16   objections and corrections to the presentence

17   investigation report; Document No. 86, the Government's

18   response to the presentence investigation report; Document

19   No. 87, the Government's sentencing memorandum and

20   response to objections to the presentence report; Document

21   Nos. 88 and 99, which are the defendant's sentencing

22   memorandum and supplemental sentencing memorandum;

23   Document No. 92, the defendant's response to the

24   Government's sentencing memorandum; Document 93, the

25   Government's correction of position; Document 98, the

1    Government's supplemental sentencing statement; Document

2    105, defendant's supplemental attachment to sentencing

3    statement; and there was a filing that was made late last

4    night, Document No. 106, which was the sealed objection to

5    the third addendum to the presentence report.  I have also

6    reviewed Document No. 104, the motion to seal Document

7    Nos. 88 and 103.

8           Counsel, did I miss any filings that I should have

9    reviewed before this hearing?

10          MR. WALZ:  No, Your Honor.

11          MR. CHAMBERS:  I don't believe so, Your Honor.

12          THE COURT:  All right.  In addition, I want to

13   advise counsel that I have reviewed a number of relevant

14   documents from the District of North Dakota case, Case No.

15   08-cr-00054, which I will refer to this hearing to as the

16   North Dakota case.

17          Among the documents I have reviewed in that case

18   were the Superseding Indictment, the Amended Judgment, the

19   transcript of the sentencing hearing and the revised

20   presentence investigation report.  I also have reviewed

21   all cases identified by PACER in which Mr. Kieffer has

22   entered his appearance as an attorney in the federal

23   courts.

24          All right.  Mr. Chambers, have you had enough time

25   to read the presentence report and all addenda and to

1    review those with your client?

2            MR. CHAMBERS:  Yes, Your Honor.

3            THE COURT:  All right.  And did you explain the

4    contents of that report to him?

5            MR. CHAMBERS:  We discussed it, and if there were

6    any questions, I answered them.

7            THE COURT:  All right.  Do you have any concerns

8    about his ability to under that report?

9            MR. CHAMBERS:  None.

10           THE COURT:  Mr. Kieffer, did you get a copy of the

11   presentence investigation report and all addenda thereto?

12           MR. CHAMBERS:  I did.

13           THE COURT:  Did you review them?

14           THE DEFENDANT:  I have.

15           THE COURT:  Do you need any additional time to

16   review them?

17           THE DEFENDANT:  I don't.

18           THE COURT:  Did Mr. Chambers explain that report to

19   you?

20           THE DEFENDANT:  We discussed it, yes.

21           THE COURT:  And do you understand it?

22           THE DEFENDANT:  I do.

23           THE COURT:  All right.  With respect to disputes as

24   to the factual contents of the presentence report,

25   Mr. Chambers, you did file a 21-page objection and

1    correction to the presentence report, which challenged

2    both the factual contents and the guideline calculation.

3         I first would like to address four of the

4    objections that I think you posed that do impact the

5    offense level calculation.  Those are the relevant conduct

6    and loss calculations under 2B1.1(b)(1)(G).  You object to

7    the inclusion of the 12 separate clients representing a

8    loss of $324,769.

9         The second objection is one to the enhancement

10   based on the number of victims under 2B1.1(b)(2)(A).  You

11   maintain that the other alleged victims and their cases

12   have nothing whatsoever to do with the instant offense.

13        The third objection is that you assert Mr. Kieffer

14   should receive an offset in the loss amount calculated

15   under 2B1.1(b)(1)(G) for the value of the services that he

16   asserts he provided to those victims.

17        And your fourth objection that I would like to take

18   up at this time as a group is the abuse of position of

19   trust or use of special skill enhancement that was applied

20   pursuant to Sentencing Guideline 3B1.3.  You maintain that

21   there was no evidence presented at trial which

22   demonstrated that the defendant ever represented himself

23   as a licensed professional.

24        Now, first I would say that I do agree that the

25   inclusion of some of this information must be excluded in

1    calculating the offense level.  I am first going to

2    explain to you how I analyze the application of the

3    sentencing guidelines and how I am inclined to rule on

4    those applications.  You do not need to reiterate the

5    arguments that you made in your filings because I can

6    assure you that I have read them and combed through them

7    very thoroughly.

8         But, after I have summarized my position and my

9    inclinations with respect to my rulings on those

10   objections, you may make any argument to me that you wish.

11        All right.  I start with United States Sentencing

12   Guideline 1B1.3(a) which states that the base offense

13   level and any specific offense characteristics are to be

14   based on all acts and omissions caused by the defendant

15   that occurred during the commission of the offense of

16   conviction.

17        The Supreme Court's rulings in <u>Booker</u> and <u>Rita</u> and

18   <u>Gall</u> and <u>Fanfan</u> indicate to me -- my reading of those

19   rulings indicate that those did not impact the

20   determination of relevant conduct at all.  In this

21   particular case, the defendant was released from prison

22   for his 1989 conviction of false claims against the United

23   States Government on January 20, 1993.

24        At trial, Natalie Sterling, the custodian of

25   records for Network Solutions testified that between 1997

1    and the mid 2000s, the defendant registered multiple dot

2    nets, dot coms and dot org websites, with addresses under

3    names that included:  Prison law, BOP watch, guilty or

4    not, Dcounsel, BOP law, BOP help and federal prison law.

5        The e-mail contact addresses for these websites was

6    either HKieffer@Dcounsel.com or HKieffer@guiltyornot.org.

7    According to a PACER search that I had conducted, the

8    defendant has entered his appearance as counsel or

9    co-counsel of record in at least 18 separate federal

10   criminal or habeas matters.

11       Of these 18 cases, the Judge in the North Dakota

12   case, in calculating the offense level in that case,

13   included the following five cases as relevant conduct;

14   three in the District of Minnesota, that would be U.S. v.

15   Noe; U.S. v. Henderson, U.S. v. Wells.  One in the Western

16   District of Missouri, U.S. v. Reed.  And the case that

17   this one was actually -- that he was tried for was USA v.

18   Bergman in the District of Colorado.

19       The total amount of loss was calculated by the

20   Judge in the North Dakota case for these five cases as

21   being $162,750.

22       Now, in calculating the offense level in this case,

23   I have excluded these five cases.  However, I am taking

24   judicial notice of the following 13 cases in which the

25   defendant falsely entered an appearance as a licensed

1    attorney on behalf of a federal criminal defendant.

2        The defendant's earliest entry of appearance,

3    according to PACER as attorney in federal case was in 1996

4    in the Ninth Circuit Court of Appeals, United States v.

5    Olsen, 96-30154.  And he entered his appearance in that

6    case as Howard O. Kieffer, Esq.

7        In the Eighth Circuit District of Minnesota,

8    Mr. Kieffer also entered his appearance in the case of

9    Knish v. Stine, 04-cv-2795.  And I have a copy of the

10   filing that he made, which is titled Affirmation of

11   Counsel in Support of Petition for Writ of Habeas Corpus

12   Under 28 United States Code Section 2241.

13       The first paragraph of that says, "I am admitted to

14   practice before the Ninth and Second Circuits of the

15   United States Court of Appeals.  I am petitioner's

16   retained post-conviction counsel in connection with his

17   petition under 28 United States Code Section 2241 for a

18   writ of habeas corpus."  He signs it as "Howard O.

19   Kieffer, Federal Defense Associates".

20       In addition, Mr. Kieffer entered his appearance in

21   the case of Martin v. Stine, 04-cv-1661.  And that was in

22   the District of Minnesota, as well.

23       In the Second Circuit, he entered his appearance in

24   U.S. v. Arthur, 03-1046.

25       In the Fourth Circuit he entered his appearance in

1     the case of U.S. v. Pritchett, P-R-I-T-C-H-E-T-T, Case No.

2     06-cv-7601.

3          In Sixth Circuit, he entered his appearance in the

4     Western District of Kentucky in USA v. York.  Two case

5     numbers came up, but I only counted it as one; 02-cr-16

6     and 04-cv-120.

7          In the Northern District of Ohio, he entered his

8     appearance in USA v. Stupka.  Again, two case numbers;

9     06-cr-213 and 08-cr-1335.

10          In the Western District of Tennessee, he entered

11     his appearance in Johnson v. Outlaw, 04-cv-2370.

12          In the Western District of Tennessee, he also

13     entered his appearance in Hopkins v. Outlaw, 04-cv-2671.

14          In the Seventh Circuit he entered his appearance in

15     U.S. v. Danton, 05-cv-828.

16          In the Eleventh Circuit he entered his appearance

17     in the Middle District of Alabama, USA v. Gibson,

18     06-cv-145.

19          In the Southern District of Florida, Shalit v.

20     United States of America, S-H-A-L-I-T, 07-cv-61928.

21          And in the Northern District of Georgia in USA v.

22     Milton, for which I did not have a case number.

23          In summary, there are more than 10 case in which

24     the defendant entered his appearance as an attorney of

25     record in the federal courts that were not included by the

1   District of North Dakota in its sentencing on relevant

2   conduct.

3        The defendant used the same scheme in all of these

4   cases, including numerous websites containing information

5   and e-mail addresses that led any person who viewed his

6   website to believe that he was an attorney.

7        He filed court pleadings misrepresenting that he

8   was a licensed attorney and admitted to practice in

9   various jurisdictions.  He attended attorney conferences

10  and told others he was an attorney.  He charged and

11  accepted fees commensurate with those charged by a

12  licensed attorney.

13       Thus, for purposes of calculating the offense level

14  in this case, even with the exclusion of the five cases

15  considered as relevant conduct in the North Dakota case, I

16  find, or I intend to find, that the defendant's relevant

17  conduct involved 10 or more victims, and although the true

18  monetary loss to the victims in this case, I believe,

19  likely exceeds $200,000, I find that the presentence

20  investigation report establishes by a preponderance of the

21  evidence that the loss was at least $152,019.  In other

22  words more than 120,000 but less than 200,000.

23       I am also inclined to reject the defendant's

24  argument that the loss amount would be offset by the value

25  of the services he provided, because he provided -- in his

1   argument he says he provided satisfactory legal services

2   to his victims.  The fact is that Mr. Kieffer engaged in

3   manipulative and fraudulent conduct which wreaked havoc,

4   not only on the court system, but more importantly, on the

5   lives of people.

6         Mr. Kieffer took advantage of defendants and of

7   their vulnerable family members who were still grieving

8   because their sons or daughters or spouses were charged

9   with or had already had been convicted of serious crimes.

10  He lied to these defendants or their family members and

11  led them to believe that he was a licensed attorney who

12  had graduated from law school.  He filed false documents

13  with the courts affirming that he was a lawyer and that he

14  was admitted to practice in the federal courts.

15        He is not and never has been a licensed attorney.

16  In fact, he has never received a juris doctorate degree.

17  All fees, for whatever purposes, paid to him as an

18  attorney are properly calculated in the loss amount

19  without any offset for purposes of calculating the offense

20  level pursuant to 2B1.1(b).

21        Now, with respect to the fourth objection relating

22  to the application of 3B1.3 the defendant's conduct in

23  targeting vulnerable victims, either defendants or their

24  grieving families, and passing himself off as an attorney

25  who had special training in criminal defense and

1   sentencing matters, when he, in fact, was not an attorney,

2   constitutes an abuse of a position of trust or use of

3   special skills as those terms are used in 3B1.3.

4        These findings would result in a 10-level increase

5   in the offense level pursuant to 2B1.1(b)(1)(F); a 2-level

6   enhancement for number of victims pursuant to U.S.S.G.

7   2.B1.1(b)(2)(A)(i); and a 2-level enhancement for abuse of

8   position of trust or use of special skill pursuant to

9   3B1.3.

10       Now, with respect to the calculation of the

11  defendant's criminal history category, because I have

12  excluded from my calculation of the offense level all

13  matters that were included as relevant conduct in the

14  North Dakota case, for purposes of calculating the

15  defendant's criminal history category in this case, 3

16  criminal points can be assessed for that conviction, and I

17  would be inclined to so assess.  Thus, the defendant would

18  have six criminal history points, which establishes a

19  criminal history category of III.

20       In summary, I come to the same calculation, albeit

21  from a slightly different route, as the probation

22  department did in its third addendum.  A total offense

23  level of 23 on Counts 1 and 2, and a criminal history

24  category of III, which would result in advisory

25  imprisonment range of 57 to 71 months, and a fine range of

1    $10,000 to $1,000,000.

2         So we'll address that first.  We won't get into the

3    consecutive or concurrent sentencing at this point or into

4    Count 3.

5         At this point, Mr. Chambers, the floor is yours.

6         MR. CHAMBERS:  May I first inquire, Your Honor?  Is

7    this -- is the record closed in terms of evidence?

8         THE COURT:  With respect to what?

9         MR. CHAMBERS:  The issues Your Honor just

10   addressed.

11        THE COURT:  Well, we are here for sentencing today,

12   unless you are asking for a continuance.

13        MR. CHAMBERS:  I am not asking for a continuance.

14   I want to know if the Government has evidence it wishes to

15   present.

16        THE COURT:  I have no idea what the Government

17   intends to do.

18        Mr. Walz?

19        MR. WALZ:  We had some exhibits that we intended to

20   offer, Your Honor.  In light of this, I would like to

21   reserve on that and see if we are going to actually do

22   that.

23        THE COURT:  Okay.

24        MR. CHAMBERS:  Well, can I assume, then, that the

25   record as it currently exists is what the Court is basing

1    it on?

2            THE COURT:  Yes.  What I just told you, the record

3    as I just explained to you, yes.

4            MR. CHAMBERS:  Because -- can Mr. Kieffer sit?

5            THE COURT:  No.

6            MR. CHAMBERS:  I have some -- quite a bit to say,

7    Your Honor.

8            THE COURT:  How long do you think you are going to

9    be?  We are set until, I believe 10:00; is that correct

10   Ms. Barnes?

11           COURTROOM DEPUTY:  Yes, Your Honor.

12           THE COURT:  All right.  So we have an hour and 15

13   minutes.

14           MR. CHAMBERS:  Fifteen or 20 minutes on the issues

15   you just addressed.

16           THE COURT:  All right.  Mr. Kieffer, you may take a

17   seat.

18           MR. CHAMBERS:  First of all, Your Honor, if I may,

19   I would like to address the loss calculation.  And I will

20   try my best not to repeat, at least at length, arguments I

21   have made in written documents.  But I think a couple

22   observations are critical.

23           First of all --

24           THE COURT:  Actually, let me address this so that

25   you don't have to address matters that you don't really

1    need to.  I do not -- I'm not taking the loss calculation

2    -- my loss calculation has nothing to do with anything

3    that took place and was included in North Dakota.  My

4    numbers are based on the amounts that were identified in

5    the presentence investigation report as related to victims

6    in the other cases that we were able to determine had

7    indicated they had paid some money.

8             MR. CHAMBERS:  As I understood it, the Court's loss

9    calculation is based on the PSI minus any amounts that

10   were counted in North Dakota.

11            THE COURT:  Exactly.

12            MR. CHAMBERS:  First of all, Your Honor, it is well

13   settled that the Government bears the burden of proving

14   loss.  That's their burden.  And they must do so by a

15   preponderance.  That is the law in this circuit, and we,

16   in our objection to the presentence investigation report,

17   made a specific objection along those lines, where we

18   said --

19            THE COURT:  And you are looking at which document

20   now?

21            MR. CHAMBERS:  Document 85.

22            THE COURT:  Okay.  What page?

23            MR. CHAMBERS:  Page 4.  And it deals with the PSI,

24   page 14, where the loss amounts are laid out.  And we deny

25   the allegations of paragraph 14 and assert that there is

1   no evidence in the record to support the allegations

2   contained in this paragraph.

3          It is not sufficient -- the PSI is not evidence.

4   The Government bears the burden of proving loss by a

5   preponderance.  And there is no evidence in the record as

6   to these amounts.  None.

7          So our view is that based upon that alone, they've

8   failed to prove any amount of loss.  Because, I mean,

9   there would be a loss to the Bergmans, because there has

10  been evidence adduced at trial of $65,750.  But that's the

11  only evidence of loss in this case.  And as the Court

12  correctly noted, those moneys, $65,750, were fully

13  accounted for in North Dakota.

14         Second, loss must relate to the offense of

15  conviction.  And, again, this is a point that we made in

16  the PSI -- in our objections to the PSI, at pages 6, 7 and

17  9 and, again, in our sentencing memo at pages 3 and 4.

18  For a loss to be considered in a guideline calculation --

19  I am quoting United States v. Griffith, Tenth Circuit,

20  "Relevant conduct must relate to the offense of

21  conviction."

22         And it is our view that -- as we have said, I don't

23  need to repeat myself on this, that we do not believe that

24  the amounts itemized as loss in the PSI relate to the

25  offense of conviction.  And I'm just looking for something

1    in the PSI here.  And I found it.  Finally, relevant

2    conduct must be criminal.  And, again, citing the Griffith

3    case, the Tenth Circuit said, "Agreeing with the reasoning

4    of our sister circuits, and making explicit what has been

5    implicit in our own precedent, we hold that for a district

6    court to consider a defendant's conduct as relevant under

7    the sentencing guidelines, the Government must prove by a

8    preponderance of the evidence that, three, the conduct

9    constituted a criminal offense under either federal or

10   state statute."

11        Now, it is our view that at least some of these

12   items, for instance, Richard Lynn, in particular,

13   Mr. Kieffer's conduct was not criminal, because his

14   conduct in that case was exclusively representation in

15   administrative BOP matters.  And the BOP actually has a

16   program statement -- program statement 542.10, which

17   specifically says that in pursuing administrative

18   remedies, an inmate can obtain assistance from outside

19   sources, and they don't have to be lawyers.

20        So, you know, the real big argument, though, is the

21   first one I made, which is the Government has the burden

22   to prove loss by a preponderance.  And we have made a

23   specific objection to the loss amounts in the PSI.  There

24   has been no proof as to those loss amounts.  Therefore, we

25   believe the loss amount is zero.  At most it is $65,750.

1           Now, I think I understand the Court's -- if I can
2     address the value issue, because I think it ties into
3     this, because I think -- I don't want to argue something
4     that's a waste of time.  If the Court is of the view that
5     no services Mr. Kieffer provided could possibly have value
6     because of his status, then that's the Court's view and
7     nothing I say is going to make a difference, and I think
8     that is basically what I heard you say.
9           I think that was Judge Conmy's view in North
10    Dakota; that services provided by a non-lawyer can't have
11    value.
12          THE COURT:  Services paid to him as a lawyer when
13    he was not a lawyer.
14          MR. CHAMBERS:  Right, cannot have value.  If that's
15    the Court's view, I disagree, but I don't get to make that
16    decision.  I can talk about what, we believe, value should
17    be deducted if the Court is even willing to consider that
18    value might have been supplied.
19          But I don't think it is correct to say -- I
20    disagree with the proposition that nothing Mr. Kieffer did
21    could possibly have value.  If I get on a bus to take me
22    to New York City, and I arrive there, and I find out later
23    that the bus driver didn't have a driver's license, I
24    still received value.
25          If someone hired Mr. Kieffer thinking that he was a

1    lawyer, and they received services that -- by people who

2    have dealt with him, say he's certainly competent under

3    the Sixth Amendment, then those people received value.

4         And that's true in the Bergman case.  From the

5    $65,000, 10,000 was paid to an attorney who sat through

6    the trial.  A forfeiture count was dismissed leading to

7    the release of $30,000 by the Government.  Certainly that

8    has value; it has at least $30,000 worth of value.  And it

9    was made clear, both by Judge Miller's comments in the

10   Bergman case, and by the United States Attorney's comments

11   when he testified at trial of this case, it was clear that

12   Betty Bergman was regarded by the Government as a

13   co-conspirator in the murder-for-hire scheme, and through

14   Mr. Kieffer's effort, she avoided Indictment.  Those are

15   valuable services.

16        So my view is the value should be taken into

17   consideration, and if it is, the numbers reduced.  Of

18   course, it all sort of becomes moot because the Court

19   isn't even counting the Bergman case.  And the other

20   cases, for instance, I believe it was Henderson and Noe,

21   in North Dakota -- we have referenced in other pleadings,

22   I think it is referenced in our memo, that Mr. Kieffer --

23   they were represented by CJA counsel, a guy by the name of

24   Bergeson, who retained Mr. Kieffer.

25        Mr. Kieffer assisted him with some drafting.  And

1    his testimony in the trial in North Dakota was that the

2    quality of his work was "very good".

3         Now, of course, you are not counting that case,

4    either.  So these values sort of become a moot point.

5         THE COURT:  I will tell you in response,

6    Mr. Chambers, if I were allowed to count, not just the

7    monetary amount that he received as loss to victims, if I

8    was allowed to count the emotional damage, the

9    psychological damage and the other damages, then I would

10   say your argument holds some water; there should perhaps

11   be some offset.  But I am not allowed to do that.

12        I am limited, as you know, to just the monetary

13   value.  So, therefore, I think it is a fair proposition

14   that if you are not a lawyer and you are paid as a lawyer,

15   you do not get offset for those fees.

16        MR. CHAMBERS:  I understand the Court's position.

17   So I don't need to belabor the point.  You understand my

18   position.

19        THE COURT:  Right.  Thank you.

20        MR. CHAMBERS:  So my view, with regard to loss, it

21   is a loss amount of zero because they haven't proved

22   anything by a preponderance.  They have not proved

23   anything by a preponderance.

24        I don't think I have a whole lot to add to the

25   multiple victims' argument I have made at paragraph 25 of

1    my objections and in paragraph 5 of the sentencing

2    memorandum.

3         With regard to the use of special skill, I do have

4    just brief comments.  And it appears to me that really the

5    issue here has morphed, because the PSI wanted to assess a

6    2-point enhancement for use of special skill.  And we

7    objected to that at paragraph 27 of our objection to the

8    PSI.

9         In response to our objection, the Government came

10   back with a different reason for an enhancement, and that

11   was position of trust.  Position of trust and use of

12   special skills are not synonymous.  The Government, in

13   support of its position -- in support and in defense of

14   the PSI, attempt to assess a special skill enhancement --

15   cited portions of the guidelines that deal with the

16   position of trust enhancement.

17        And I think it is important that we not mix apples

18   and oranges here.  Other than that, my objection, because

19   I am dealing with it as a special skill, because that is

20   what the PSI said, I have not been on notice that anybody

21   wants to call it now -- anybody other than the Government

22   wants to call it "position of trust".  And so my objection

23   to that deal with it being regarded as a position of skill

24   enhancement.  And we object to that for the reasons noted

25   in our objections.

1        So the four issues the Court had were loss, offset

2   for value, multiple victims and the special skill/position

3   of trust enhancement, if I am correct; is that right?

4        THE COURT:  Yes.

5        MR. CHAMBERS:  I think that is all I have to say.

6   The point I really want to leave you with, though, is that

7   there has been no proof of loss.

8        THE COURT:  All right.  Mr. Walz, do you have any

9   evidence to present to me on proof of loss?

10       MR. WALZ:  Yes, Your Honor, actually I do.

11       MR. CHAMBERS:  Excuse me, that is why I asked if

12   there was going to be evidence.

13       THE COURT:  That is what he said he reserved,

14   Mr. Chambers.  He said he would reserve until he heard.

15       MR. CHAMBERS:  Well, okay.  But if I could make a

16   request that we actually get the evidence on the record,

17   then I can argue, because it is not fair for me to make

18   objections.  The Government had the opportunity to present

19   evidence, to forego those and say we are going to reserve

20   them, and then when I lay my cards on the table, say, oh,

21   yeah we will put some evidence on now.

22       THE COURT:  You should have asked for that when he

23   reserved.  But that is fine, I will allow to you rebut if

24   you need to.

25       Mr. Walz, you may proceed.

1          MR. WALZ:  Call Agent Wilcox, Your Honor.

2          COURTROOM DEPUTY:  Your attention, please.

3          THE COURT:  Mr. Chambers, Mr. Kieffer, please pay

4    attention.

5                    **SPECIAL AGENT TODD WILCOX**

6    having been first duly sworn, testified as follows:

7          COURTROOM DEPUTY:  Please be seated.

8          Please state your name, and spell your first and

9    last names for the record.

10          THE WITNESS:  Todd Wilcox, T-O-D-D W-I-L-C-O-X.

11                    **DIRECT EXAMINATION**

12    **BY MR. WALZ:**

13    Q.    Mr. Wilcox, where do you work?

14    A.    I am an FBI in Denver, Colorado.

15    Q.    A Special Agent?

16    A.    Yes.

17    Q.    And how long have you been a Special Agent?

18    A.    About 19 years.

19    Q.    And you were the case agent on this particular

20    matter; is that correct?

21    A.    Yes, I was.

22    Q.    In connection with your duties as a case agent -- I

23    want you to look at what has been marked as Government's

24    Exhibits 1, 2 and 3.  Are those in front of you?

25    A.    Yes, they are.

1    Q.    Agent Wilcox, what are Government's Exhibits 1, 2 and

2    3?

3    A.    Exhibit 1 is a letter written by an inmate down in

4    Florence, Colorado.  That was initially addressed to the

5    U.S. Attorney's Office here in Denver, and then found its

6    way to me.

7    Q.    As a result of Exhibit 1, did you ask that -- first

8    of all, who is Exhibit 1 from?

9    A.    An inmate identified as Richard Lynn.

10   Q.    As a result of your ultimate receipt of Exhibit 1,

11   did you ask that Exhibit 2 be prepared, or that Mr. Lynn

12   be interviewed?

13   A.    I did.  I sent out a lead to Colorado Springs, and

14   Mr. Lynn was interviewed while in custody.

15   Q.    And what is Exhibit 2, then, Agent Wilcox?

16   A.    Exhibit 2 is a copy of an FBI 302 Report of Interview

17   of Mr. Richard Lynn, which took place on January 6, 2009.

18   Q.    And did you ultimately receive Exhibit 2?

19   A.    Yes.  After Mr. Lynn was interviewed, I did receive

20   Exhibit 2.

21   Q.    And what is Exhibit 3?

22   A.    Exhibit 3 is -- I believe this is a document that was

23   provided to the interviewing agents by Mr. Lynn of, I

24   guess you call it legal mail from Mr. Kieffer to Mr. Lynn.

25          MR. WALZ:  Offer Exhibits 1, 2 and 3, Your Honor.

1           MR. CHAMBERS:  No objection.

2           THE COURT:  All right.  Exhibits 1, 2 and 3 will be

3      admitted.

4           (Exhibit Nos. 1-3 are admitted.)

5      Q.   (BY MR. WALZ)  Looking at the first paragraph of

6      Exhibit 1 for a minute, Mr. Wilcox, will you read that

7      paragraph into the record.

8      A.   This is a copy of a letter dated October 15, 2008.

9      "Dear, Sir.  I recently read in the Denver Post, Monday,

10     October 13th, about Howard O. Kieffer, the fake lawyer."

11     Q.   Would you read to -- the last word is "handled".  The

12     next couple of sentences.

13     A.   Keep reading?

14     Q.   Yes, please.

15     A.   Okay.  "I hired Mr. Kieffer to represent me in a

16     prison disciplinary appeal, and had a friend, Dale

17     Rodberg, send him $5,000 as his fee to appeal it into the

18     district court, if necessary.  He took my money and then

19     called Dale, without my knowledge, and tried to get

20     another 3.5K --" $3,500 "-- stating he had talked to me

21     and I wanted some other things handled."

22     Q.   Why don't you just read the rest of the letter,

23     please.

24     A.   The letter goes on, "He filed a one-page appeal late,

25     and then refused to accept my calls, did not answer my

1    letters, and refused to send my legal documents back, even

2    when I sent him a SASE to do so."

3    Q.   Last paragraph.

4    A.   "I wrote him off as just another con man attorney.

5    So I wasn't too shocked to see he's a fraud.  If you need

6    any help in his prosecution, I will help in whatever way I

7    can.  Sincerely, Richard Lynn."

8    Q.   And would you turn to the last paragraph of Exhibit

9    3, please, the typewritten letter.

10   A.   I am sorry, go where?

11   Q.   Last paragraph of Exhibit 3.

12   A.   The second page?

13   Q.   Yes, sir.

14   A.   Second page, last paragraph.  "I look forward to

15   hearing from you.  If there are those that need or desire

16   representation, assistance or advocacy on post-conviction

17   matters or other issues relative to their conviction,

18   sentences or incarcerations, especially with BOP issues, I

19   always appreciate direct referrals.  I have enclosed a few

20   business cards for that purpose.

21       Accordingly, if you do not receive an answer, I am

22   not available, and you would be advised to try again

23   later.  Very truly yours, Federal Defense Associates."

24   And it has Howard Kieffer's signature, and then the name

25   "Howard O. Kieffer".

          1          MR. WALZ:  Those are all of the questions I have of

          2    Agent Wilcox.  I will be prepared to argue after

          3    cross-examination, if that is all right, Your Honor.

          4          THE COURT:  All right.

          5          MR. CHAMBERS:  I don't have any questions.  Thank

          6    you.

          7          THE COURT:  Mr. Walz, you are not going to offer

          8    any evidence of the other amounts outstanding?

          9          MR. WALZ:  I am sorry, Your Honor, I was not

         10    prepared to do that.  But I do have an argument to make

         11    that I think will satisfy the Court's burden of proof.

         12          THE COURT:  All right.  Mr. Wilcox, you may step

         13    down.

         14          Mr. Walz, you may proceed.

         15          MR. WALZ:  Your Honor, first of all, the Government

         16    provided to the probation office sufficient evidence of

         17    victims who had hired Mr. Kieffer and the amount of money

         18    that they supplied to Mr. Kieffer.  I'm not sure whether

         19    Mr. Kieffer's argument is that the amounts weren't paid,

         20    which is one item, or whether the amounts were -- whether

         21    the money paid was actually pursuant to a criminal act.

         22          Let's take the second one first.  The evidence from

         23    Mr. Lynn, as well as the evidence from Mr. Bergman at

         24    trial, as well as the evidence that the Court had cited

         25    today, and the evidence of Mr. Kieffer's long-standing

1    conduct as a -- I will use the words fake attorney,

2    certainly provide a basis to sustain this Court's loss

3    calculation.

4         The evidence at trial was that Mr. Kieffer had

5    websites for a long period of time; 7 or 8 years, as I

6    recall.  The evidence at trial from Ms. Shifman was that

7    Mr. Kieffer had represented clients.  In 2006 she found

8    out that he was not a lawyer, and told him that he was not

9    a lawyer and that what he was doing was just plain wrong.

10        The evidence at trial indicates that even after

11   that period of time, Mr. Kieffer engaged in the

12   representation of clients in various places.

13        The Court found, I believe, 12 instances other than

14   the ones referred to in North Dakota where Mr. Kieffer had

15   entered appearances.  Based upon the amount of

16   Mr. Kieffer's fees from North Dakota -- from the North

17   Dakota cases, the Court -- which the Court can take

18   judicial notice of as having been established, it is

19   reasonable, and the Court is aware that all the Court need

20   find is a reasonable estimate of loss.

21        It is reasonable that Mr. Kieffer was charging

22   somewhere between $5,000, which he charged Mr. Lynn, and

23   $65,000; that was for a trial, so admittedly that would be

24   high.  About 10- to $20,000, according to the matters in

25   North Dakota, that Mr. Kieffer was charging these clients

1    amounts of money, which apparently Mr. Kieffer never

2    denied that he was charging them the money.  That doesn't

3    seem to be the nature of his investigation -- or his

4    objection to the presentence report.

5        He was charging money.  So the question becomes,

6    was it part of a criminal scheme?  And I think the Court

7    has been persuaded, and I don't want to unduly repeat

8    this, but clearly every dollar that Mr. Kieffer charged

9    under the guise of being an attorney, whether it was for

10   action in court or action in front of the Bureau of

11   Prisons, is criminally-derived money.  And the evidence

12   from Mr. Lynn establishes that.

13       He hired him to be his lawyer.  And he, according

14   to the documents now in evidence, felt defrauded, and was

15   defrauded, because Mr. Kieffer was not a lawyer.

16       So based upon all of the facts; his continuous

17   course of conduct, 12 appearances that the Court has found

18   on pacer that he entered, Ms. Shifman's testimony, the

19   evidence that we submitted to the Court pretrial about

20   Mr. Kieffer appearing in the Western District of

21   Tennessee.  All of those facts taken together allow the

22   Court to come up with a reasonable estimate of loss.

23       And that reasonable estimate of loss is based on

24   the fact that he represented multiple clients over many --

25   over multiple years.  He charged Mr. Lynn the lowest

1    amount that we have seen, $5,000, and charged other people

2    as a professional.  Based upon all of those facts, the

3    Court's loss calculation is sustainable as under the

4    preponderance of evidence standard.

5         THE COURT:  All right.  Thank you.

6         Mr. Chambers, do you wish to rebut?

7         MR. CHAMBERS:  Very briefly, Your Honor.  I would

8    like to revise my prior comments because now there is

9    evidence of loss; there is evidence of $5,000 loss.

10         THE COURT:  Well, I will say that one of the cases

11    that I reviewed from the Sixth Circuit was United States

12    of America v. Stupka, that was the 06-cr-213.  In that

13    case, there was a letter from Mr. Stupka dated July 16,

14    2008, which indicates that he paid Mr. Kieffer $20,000 to

15    represent him in that matter.

16         MR. CHAMBERS:  I have not seen that letter.  All of

17    the cases that Your Honor mentioned I viewed on PACER, as

18    well, perhaps in varying degree of detail than Your Honor

19    did.

20         THE COURT:  Okay.  So there is some indication that

21    for court filings, based on what he charged, what was

22    referenced in the North Dakota case, he charged between

23    15,000 and 40,000 to represent defendants on either an

24    appeal of their criminal conviction or a filing of a

25    habeas corpus.  And even if I took the lowest amount, the

1   15,000 per defendant, with the additional 13 defendants

2   that I have identified here, that would exceed the 120,000

3   that I indicated.

4        MR. CHAMBERS:  Your Honor, that is not proof by a

5   preponderance of the evidence; that is making things up.

6        THE COURT:  All I have to do is make a reasonable

7   estimate.  All of the criminal court filings -- what we

8   have on record today is that for administrative

9   proceedings, he may have charged as low as 5,000.  But for

10  all of the criminal cases, he charged 15-, 20-, 40-, 60-.

11  It was much higher than that.  I just need to make a

12  reasonable estimate of the amount of loss.

13       MR. CHAMBERS:  There is difference between proof by

14  a preponderance of the evidence and making things up.  You

15  know -- and the law is the Government bears the burden of

16  proving loss by a preponderance of the evidence, and they

17  have not done it.  And to fall back and say you can make

18  reasonable estimates based upon these number of people is

19  not proof by any burden -- by any burden.

20       THE COURT:  All right.

21       MR. WALZ:  Does the Court wish to now address the

22  other issues?

23       THE COURT:  Yes, if you wish.

24       MR. WALZ:  I would note one other fact, Your Honor,

25  and that is in the presentence report, but in the

1    evidence, apparently it came from Mr. Kieffer, himself, on

2    page 17, paragraph 87 of the presentence report, it says,

3    "The defendant was self employed as executive director of

4    Federal Defense Associates from '93 through 2008.  His

5    office was originally in Santa Anna and moved to Duluth.

6         The defendant estimated he earned between $5,000

7    and $6,500 per month."  Take 60,000 a year times however

8    many years the Court wants, and that is more than

9    sufficient to sustain the Court's loss calculation.

10        THE COURT:  All right.  Thank you.

11        MR. WALZ:  The other -- excuse me, Your Honor, I

12   left me book here.  Taking the last point first, in the

13   notes to 3B1.3, abuse of position of trust or special

14   skill -- and I know Ms. Kozak cited this to the Court, it

15   says, "This adjustment applies to persons who abuse their

16   positions of trust or their special skill to facilitate

17   the commission of a crime.  The adjustment also applies to

18   persons who provide sufficient indicia to the victim that

19   they legitimately hold a position of public or private

20   trust when, in fact, they do not."

21        So the guideline seems to lump them together.  It

22   is one or the other.  From that language it appears to be

23   a position of public or private trust when they

24   indicate -- or when they represent that they hold such a

25   position and they do not.  So that supports that guideline

1    adjustment.

2         The number of victims, I think, bears -- requires

3    no further discussion.  And for the offset, we would rely

4    furthermore, Your Honor, on the case law that I believe we

5    cited to the Court early on, and the Tenth Circuit's

6    opinion in the Bergman case, that a person who represents

7    himself to be a lawyer and is not, per se obstructs

8    justice.

9         And, indeed, it would be anomalous for the Court to

10   say that I am going reduce the loss calculation by the

11   value of the services he rendered when, in fact, he is

12   obstructing justice by rendering those services.  I think

13   that further supports the Court's rulings.

14        Beyond that, I have nothing to add.

15        THE COURT:  All right.  Let's now address the fifth

16   argument that contempt is not a felony, therefore, 2X5.1

17   is not the applicable guideline.

18        Mr. Chambers, I am inclined to find that Count 3 of

19   the Indictment; contempt, is a felony offense.  2J1.1 of

20   the guidelines on contempt directs me to 2X5.1, other

21   offenses, which in turn instructs me that if the offense

22   is a felony for which no guideline has expressly been

23   promulgated, I am to apply the most analogous offense

24   guideline.

25        Reviewing those, the most analogous offense

1    guideline appears to me to be 2J1.2, obstruction of

2    justice, which imposes a base offense level of 14.  And

3    because the offense resulted in substantial interference

4    with the administration of justice, that offense level is

5    increased by 3.  Thus, the adjusted offense level for

6    Count 3 would be 17.  And because Count 3 represents a

7    different victim from Counts 1 and 2, the conviction for

8    Count 3 would not group with the convictions for Counts 1

9    and 2, and the multiple count adjustments of 3D1.4 are

10   applicable.

11        My calculation -- well, my calculation of the

12   offense level would be offense level 17, criminal history

13   category III, 30 to 37 months.

14        MR. CHAMBERS:  Just a couple points, Your Honor.

15   And, first of all, we had made argument that contempt is

16   not a felony.  Our position on that is in the papers, I

17   don't need to repeat them.  I would just observe that the

18   Government relies on the Voss case.  And whether or not

19   contempt was a felony or not does not appear to have ever

20   been an issue in Voss.  That was not an issue that was

21   litigated.  And we have supplied the Court with authority

22   that contempt is not a felony.

23        And our arguments there are paragraphs 31 and 32 of

24   our objections to the PSI, and I think around page 7 of

25   our sentencing memorandum.

1          Secondly, the Court -- we disagree that Counts 2

2     and 3 are different victims.  Counts 2 and 3 are precisely

3     the same victim; the United States District Court for the

4     District of Colorado.  False statements in Count 2 is a

5     statement made -- allegedly made by Mr. Kieffer to Mark

6     Fredrickson, an employee of this Court.  And the contempt

7     is a contempt against this Court.  Same victim.

8          Assuming for purposes of discussion that contempt

9     is a felony and the Court should seek guidance from the

10    guidelines, we do not agree that the appropriate guideline

11    is 2J1.2, obstruction.  For the reason that -- and I think

12    we have written this up -- yeah, on page 11, that the

13    Sentencing Commission intended the obstruction guideline,

14    2J1.2, to have the same meaning as the crime, obstruction

15    of justice.

16         And in this case, the evidence adduced at trial did

17    not establish a violation of 18 United States Code Section

18    1503, therefore, 2J1.2 is not the appropriate guideline

19    where the court should seek guidance.

20         Rather, if the Court is inclined to seek guidance

21    from the guidelines, which we don't think you should do

22    because we don't think it is a felony, the appropriate

23    guideline would be 2B1.2, which is the loss calculations,

24    which is the same one the Court uses for Count 1.

25         THE COURT:  And why would that be relevant?

1          MR. CHAMBERS:  Because it is all part of the same

2     scheme, Your Honor.

3          THE COURT:  But you just told me they weren't part

4     of the same scheme.

5          MR. CHAMBERS:  Well, if you are finding that they

6     are -- I mean, I said assuming for purposes of argument

7     that you are going to make this finding -- it not my

8     preferred position, Your Honor.  I am saying, if you are

9     going to make this finding, then our position in that case

10     would be that 2J should not apply, the 2B should.  I don't

11     -- it is not my first choice.

12          THE COURT:  Okay.  Mr. Walz, anything on this

13     matter?

14          MR. WALZ:  We stated our position in the papers.  I

15     think Mr. Chambers' second argument goes to the grouping

16     of the counts.  And there is definitely a different harm

17     embodied in Count 3 than is the harm that is embodied in

18     Counts 1 and 2.  Count 2 clearly was part of the scheme.

19     And Count 2 was also part -- facilitated the obstruction

20     of justice.

21          But the contempt count clearly involves a specific

22     harm to this Court, irrespective of the fraud scheme

23     because of the obstruction of justice, because of the need

24     for further proceedings, because of the matter going to

25     the Tenth Circuit and coming back.  That would be our

1    position.

2         THE COURT:  All right.  That brings us then to

3    whether the sentence I impose should be concurrent or

4    consecutive to the sentence being served by the defendant

5    as a result of his conviction in North Dakota.

6         I have consulted Section 5G1.3 of the United States

7    Sentencing Guidelines which addresses the imposition of a

8    sentence where the defendant has an undischarged term of

9    imprisonment.  The Sentencing Commission's purpose in

10   developing 5G1.3 was to build in a safeguard to the

11   sentencing guidelines to protect a defendant from

12   potential unfairness of longer sentences resulting from

13   duplicative consideration of the same relevant conduct

14   during sentencing in separate prosecutions.  There is some

15   statement to the effect that that would otherwise erase

16   the effect of a downward departure in a prior trial for

17   substantial assistance to the Government.  That would not

18   be applicable in this case because in this case the

19   defendant went to trial on both cases.

20        The comment 2 to 5G1.3(b) provides that subsection

21   (b) applies in cases in which all of the prior offense is,

22   (i) relevant conduct to the instant offense under the

23   provisions of subsection (a)(1), (a)(2) or (a)(3) of

24   1B1.3.  And the Court will acknowledge that the prior

25   offense would be considered relevant conduct in this case

1    in most instances.  But the second part of that test,

2    because it is a two-prong test, is that that prior offense

3    has resulted in an increase in the offense level for this

4    case.

5         Now, that two-prong test was affirmed by the Tenth

6    Circuit in United States v. Johnson, and at that time that

7    was a 1994 case.  The Tenth Circuit ruled that 5G1.3(b)

8    required this Court to impose a concurrent sentence.  Now

9    we know the guidelines are advisory, and I am not

10   required, I only need to refer to them.

11        But it said a two-part test.  "The defendant is

12   subject to an undischarged term of imprisonment," which is

13   true in this case.  And, "The conduct underlying the

14   undischarged term of imprisonment has been "fully taken

15   into account" in the determination of the offense level

16   for the instant offense."

17        Now, as I indicated, the first prong of that test

18   has been met.  The prior offense, the North Dakota

19   conviction, is relevant conduct to the instant case.

20   However, the second prong is not met.  Subsection 5G1.3(a)

21   does not apply because the instant offense was not

22   committed while the defendant was serving a time of

23   imprisonment.

24        Likewise, 5G1.3(b) does not apply because in

25   calculating the offense level in this case, I have not

1    included either the crime for which defendant was

2    convicted in North Dakota, nor any of the relevant conduct

3    included by the sentencing judge in the North Dakota case

4    when he computed the defendant's sentence in the North

5    Dakota case.

6         Looking, then, to 5G1.3(c), which applies to all

7    cases involving an undischarged term of imprisonment that

8    does not fall within subsections (a) or (b), the policy

9    statement grants me, as sentencing court, discretion to

10   determine whether that sentence should be concurrent,

11   partially concurrent or consecutive in order to "achieve a

12   reasonable punishment for the instant offense."

13        The Application Note 3(A) instructs me to consider,

14   among other things, the factors laid out in 18 United

15   States Code Section 3553(a), the type and length of the

16   prior undischarged sentence, the time served on the prior

17   undischarged sentence, and the time likely to be served

18   before release, and any other circumstances relevant to

19   the determination of an appropriate sentence for the

20   instant offense.

21        Now, I previously detailed many of the

22   circumstances that I find to be relevant to the

23   determination of an appropriate sentence in this case.  In

24   addition, I have considered the need for a sentence that

25   reflects the seriousness of the offense, promotes respect

1   for the law, provides just punishment, avoids unwarranted

2   sentencing disparities, and affords adequate deterrence to

3   protect the public.

4        Based on all of these factors, I would be inclined

5   to impose a sentence in this case that would run

6   consecutively to the undischarged term of imprisonment

7   imposed in the North Dakota case.

8        Mr. Chambers?

9        MR. CHAMBERS:  Your Honor, we have briefed this

10  issue.

11       THE COURT:  You did.  And as I said, you don't need

12  to repeat your arguments.  I read it.  But to make your

13  record.

14       MR. CHAMBERS:  It is a good brief, too.

15       THE COURT:  It is an excellent brief.

16       MR. CHAMBERS:  I don't need to repeat myself with

17  regard to 5G.  I do think -- if I can go back to an issue

18  that came up before, and I should have said this then,

19  because I think it is somewhat relevant to this, and that

20  is the Court's exclusion of loss amounts considered in

21  North Dakota, and the effect of that is two-fold.

22       First of all, applying the Court's reasoning, if I

23  understand you correctly, by doing that, the second prong

24  of 5G1.3(b) is avoided.

25       THE COURT:  Yes.  Because I did not take it into

1      account at all in the determination of the offense level.

2              MR. CHAMBERS:  I understand.  And the further

3      consequence of that is -- which we also object to, is the

4      Court then assessed criminal history points from North

5      Dakota.

6              THE COURT:  Which is not part of the 5G1.3 test.

7              MR. CHAMBERS:  Not part of the 5G, but it is

8      related.  It all springs from the same factual

9      determination, or a mixed question of facts and law,

10     whether or not the losses from North Dakota are going to

11     be counted in Colorado.  And the consequence of that is

12     24, 5G, and also the increase in the offense level, which

13     we object to both.

14             THE COURT:  Well, I don't quite follow that,

15     because there is no increase in the offense level.

16             MR. CHAMBERS:  I mean increase in the criminal

17     history category.  I am sorry, I misspoke.

18             THE COURT:  All right.

19             MR. CHAMBERS:  So just to make the record clear, we

20     believe 5G1.3(b) should apply.  But as we said in our

21     brief, even if it doesn't, and clearly subsection (a)

22     doesn't apply.  If this falls under (c), we believe that

23     there are compelling reasons why the sentence should run

24     concurrently.

25             The purpose of 5G1.3(c) is to ensure that a court

1    fashions a total sentence that would be roughly equivalent

2    to what the defendant would have received if he or she had

3    been sentenced at the same time in federal court for all

4    relevant offenses.

5         That is Tenth Circuit case of United States v.

6    Johnson.  And that appears to be precisely what happened

7    in North Dakota.  That is exactly what happened in North

8    Dakota.

9         So we do object.  We think that it should be

10   5G1.3(b).  If it is not, 5G1.3(c).  The Court's discretion

11   should be informed to impose concurrent sentences, as

12   recommended by probation.

13        THE COURT:  All right.  Mr. Walz?

14        MR. WALZ:  We obviously agree with the Court's

15   reasoning.  I think one other prong that may separate this

16   from the North Dakota case is that the conduct that is the

17   subject of the criminal conviction in this case was not

18   fully taken into account in North Dakota because the North

19   Dakota judge did not take into account the obstruction of

20   justice that occurred because of Mr. Kieffer's trying the

21   case here.

22        He took into account -- the judge in North Dakota

23   took into account the loss figure, but did not take into

24   account the actions of Mr. Kieffer in North Dakota that

25   resulted in the Bergman proceedings that have obstructed

1    justice.

2         THE COURT:  Right.  That was one thing that really

3    did bother me about the North Dakota judge's sentence.

4    The only place that he took into account relevant conduct

5    was in the loss figure.  And he didn't include all of the

6    other cases, he only included, for some reason, three of

7    them, or I guess four of them, including the one there.

8         I didn't understand why he picked and chose the way

9    he did.  Clearly, he did not consider all of the relevant

10   conduct in purposes of other aspects of calculating the

11   offense level.

12        MR. CHAMBERS:  If I could rise in defense of Judge

13   Conmy, I believe he was acting on the evidence he was

14   presented.  He was -- he ruled based upon the evidence and

15   the record before him, as this Court should do.  He

16   limited his loss calculation to the ones where there was

17   evidence.

18        THE COURT:  I didn't see that in the record, but

19   that's fine.

20        All right.  There were no motions for downward

21   departure but, Mr. Chambers I did read your sentencing

22   statements as requesting that I impose a variant sentence.

23   So if you have anything further with respect to that.

24   Those are the issues I believe will affect my offense

25   level.  The other objections will not affect the offense

1      level or my sentence.

2            Therefore, if you want to make argument to me about

3      3553(a), I will hear that now.

4            MR. CHAMBERS:  Your Honor, I think we did request a

5      downward departure with regard to criminal history.  It is

6      our view that criminal history category II overstates the

7      seriousness of Mr. Kieffer's --

8            THE COURT:  You know my position on that, so you

9      better address all of his criminal history.

10           MR. CHAMBERS:  Well, if you look at it, his most

11     recent conviction that should count, because we think the

12     Court is wrong in counting North Dakota, is 23 years old.

13           THE COURT:  Well, recent conviction.  Look at his

14     actions.  He got out of prison in 1993, and he was acting

15     as a lawyer in 1997.  He didn't get caught.  That is why

16     there is a gap of 15 years, because he didn't get caught.

17           MR. CHAMBERS:  Well, criminal history is to -- the

18     criminal history guidelines have been developed based upon

19     convictions.  That's --

20           THE COURT:  I agree with that, for purposes of

21     calculating the criminal history category, you look at the

22     convictions.  That doesn't mean I turn a blind eye and

23     say, oh, you never got caught for 15 years, so I can't

24     include all of the other bad activity that -- I have a

25     record.  You have entered an appearance as an attorney

1      when you are not.

2            MR. CHAMBERS:  I don't believe that the Court can

3      consider conduct that did not result in a criminal

4      conviction in making a criminal history calculation.

5            THE COURT:  I am not making a criminal history

6      calculation, I am looking under 3553(a).

7            MR. CHAMBERS:  Well, I am still talking about the

8      motion for downward departure.  That is something

9      different.

10           THE COURT:  Okay.  That is fine.  But you are

11     asking for a downward departure based on factors -- you

12     are looking at the convictions, but you are telling me I

13     should disregard all of the prior convicted conduct

14     because it is 20 years old.

15           MR. CHAMBERS:  That is what the sentencing

16     guideline says, and there is a reason it says that.

17           THE COURT:  For purposes of the criminal history

18     calculation.

19           MR. CHAMBERS:  Yes.  Just so we are not talking

20     past each other, when we are talking about the chapter 4

21     calculation, not talking about 3553 and variances, we are

22     talking straight chapter 4, the Court is limited to

23     convictions.  Cannot consider conduct --

24           THE COURT:  I agree.

25           MR. CHAMBERS:  -- that did not result in a

1    conviction.  So, therefore, we have made our motion, and

2    it is somewhere in this stack of papers.  I think it is in

3    the -- I think it is in our objections, and it might be

4    repeated in our supplemental sentencing memorandum.

5         THE COURT:  I do recall seeing that.  All right.

6         MR. CHAMBERS:  So that was that.  Now, what was the

7    other question?

8         THE COURT:  The other one was the variance.

9         MR. CHAMBERS:  We've addressed that, as well, in

10   our Document 99.  And also in our sentencing memorandum,

11   which is 88 and 99, the reasons why we do not believe a

12   variation upward pursuant to 3553 is appropriate.

13        First of all, let me just say that as a follow up

14   to the last conversation we just had about whether the

15   Court, in assessing his criminal history, not under

16   chapter 4, but for purposes of a variance, should consider

17   other conduct that did not result in conviction.

18        And the Court, in our view, should be very cautious

19   about -- criminal history is addressed in chapter 4.  And

20   the Court should be cautious about varying from what the

21   guidelines say based upon considerations that are

22   accounted for in the guidelines.  And criminal history is

23   accounted for in the guidelines.

24        Beyond that, I would invite the Court's attention

25   to our arguments in Document 99, pages 5 through the top

1   of 9, that address variant issues, particularly starting

2   on page 8 and the goal of the guidelines, and the fact

3   that criminal history is taken into consideration in

4   chapter 4.  Because in this case we believe all offender

5   and offense characteristics have been addressed in the

6   guidelines; that a variant sentence here undermines the

7   goal of sentencing uniformity.

8        3553 and the demise of mandatory guidelines gives

9   this Court power.  We acknowledge that.  But the goal of

10   the guidelines remains, and that goal is hurt, and the

11   criminal justice system is hurt when courts go rogue.  And

12   we think, based upon all of the arguments and authority

13   cited in multiple pleadings, that a variant sentence under

14   3553 is appropriate.

15        The recidivism study that we cited I think is

16   instructive.  The proof -- the empirical data shows that

17   criminal history points and criminal history category are

18   superb predictors of future offending.  Those are studies

19   that can't be ignored.

20        So if the Court has specific questions -- are we at

21   the point for me to say the last things I have to say here

22   at the end.

23        THE COURT:  Yes.

24        MR. CHAMBERS:  Your Honor, I understand that -- I

25   don't want to diminish Mr. Kieffer's -- the conduct that

1    Mr. Kieffer has been convicted of.  I treaded very lightly

2    in drafting my conclusion to Document 99, because it is a

3    weird situation here where the sentencing court is the

4    victim.

5            THE COURT:  It wasn't my court.

6            MR. CHAMBERS:  It is the United States District

7    Court for the District of Colorado.

8            THE COURT:  It wasn't my trial.  It has no impact

9    on my sentence whatsoever.

10           MR. CHAMBERS:  Well, I hope not.  Because I think

11   there is -- would be a human temptation to attempt to

12   vindicate the dignity of the institution you work for.

13           THE COURT:  I don't think the dignity of this

14   institution has been in any way, you know, impacted.  I

15   think we learned and put into effect certain safeguards.

16   We don't take lawyers at their word any more.  We don't

17   take applicants at their word.  We do checks now.  But I

18   don't think it has impacted dignity of this Court.

19           MR. CHAMBERS:  Well, Your Honor, I think in my

20   conversations with the legal community, I don't know if it

21   affected the dignity of the court, but it was an

22   embarrassment that a person who apparently is not a lawyer

23   could come into a courtroom in this building and try a

24   case and not get caught.

25           The judge didn't notice.

1          THE COURT:  Con men do it all of the time.

2          MR. CHAMBERS:  It is still an embarrassment.  And

3   that is the way my colleagues think that this Court looks

4   at it.  Not particularly Your Honor, but this Court as an

5   entity.

6          You know, resume puffing is really what this is.

7   It is aggravated resume puffing.

8          THE COURT:  Hardly.

9          MR. CHAMBERS:  That is what it is.  It is

10  aggravated resume puffing.

11         THE COURT:  No.  It goes much beyond that

12  Mr. Chambers.

13         MR. CHAMBERS:  You know, if you resume puff in

14  federal court, you face the wrath of a district court

15  judge.  If you are the Attorney General of Connecticut and

16  you resume puff, you get to be the senator.

17         Thanks.

18         THE COURT:  All right.  Mr. Walz?

19         MR. WALZ:  Regarding the criminal history category,

20  Your Honor, I think actually Mr. Kieffer is arguing

21  against himself.  He says that there should be a downward

22  variance because his one conviction is old, but the Court

23  shouldn't take into account any of the other old

24  convictions, either.

25         I mean, if we apply the guidelines literally, then

1    there shouldn't be downward variance because that

2    conviction is clearly within the time frame.  If he wants

3    to ignore the guidelines and say we can erase time, then

4    the Court could properly and should properly take into

5    account the other convictions which did not result in an

6    increase in his criminal history score.

7           But be that as it may, the law is clear that the

8    Court may take into account under the guidelines those

9    prior convictions, because they do reflect the inadequacy

10   of his criminal history score.  They do, and so what the

11   Court announced a little over a month ago is entirely

12   supportable under the guidelines.

13          I would disagree with Mr. Chambers on one part, on

14   one aspect of his argument.  He says that it is -- the

15   guidelines are to promote consistency.  The guidelines

16   were to eliminate unwarranted disparity.  The disparity

17   that -- any disparity between the guidelines and

18   Mr. Kieffer's conduct here is not unwarranted.

19          For the Court to go up, either as a departure from

20   the guidelines or a variance from the 3553(a) factors, is

21   entirely warranted by all of the factors that the Court

22   enumerated on July 7th.  And I don't need to repeat those.

23   The Court has considered those much more fully than even I

24   could articulate.

25          There is one other point I would like to make,

1    though, regarding the 3553(a) factors.  One of the factors

2    is to promote respect for the law.  Mr. Bergman, before

3    the trial told me, he thought that the Government lawyers

4    in this case knew that Mr. Kieffer wasn't a lawyer,

5    apparently because they wanted to go up against somebody

6    who wasn't a lawyer and they could win more easily.

7          That, to me, is an indication that the public

8    doesn't fully understand our role as lawyers to uphold the

9    law.  And this -- and the Court's opportunity to sentence

10   here, particularly on Count 3, the obstruction of justice

11   count, or the contempt count, which resulted in

12   obstruction of justice, gives the Court the real

13   opportunity to promote respect for the law, so the public

14   can know that when people walk into court and stand at

15   this lectern, or any other lectern, that they are

16   qualified, they have gone to law school, they have passed

17   the bar examination, one or more, they have practiced law,

18   and they are qualified to appear in front of this Court.

19         And the Court's sentence here can go a long way to

20   promoting respect for the law, which is a 3553(a) factor.

21         THE COURT:  All right.  Thank you.

22         Mr. Kieffer, do you wish to make a statement to the

23   Court before I impose sentence.

24         THE DEFENDANT:  I believe Your Honor has considered

25   what I submitted.

1          THE COURT:  I have.  I have reviewed everything you

2     have submitted.

3          All right.  Counsel, anything further?

4          MR. CHAMBERS:  Your Honor, just before the Court

5     imposes sentence, if I might just make sure that all of my

6     objections and the numerous pleadings that have been filed

7     relevant to sentencing, and my comments today are

8     reasserted; that they are not waived for purposes of

9     appellate review.

10          I know that sometimes the circuit is a little --

11     well, they just are what they are about saying that

12     arguments, objections weren't reasserted or weren't

13     preserved.  Any objection that we have made is reasserted.

14          THE COURT:  All right.  Thank you.

15          All right.  The Court is going to take 15-minute

16     recess to consider what has been presented to it today.

17     We will be back in session at about, let's say 10:10.  The

18     Court will be in recess.

19          (A break is taken from 9:51 a.m. to 10:31 a.m.)

20          THE COURT:  You may be seated.

21          All right.  Mr. Chambers, would you and Mr. Kieffer

22     please approach the podium.

23          Court will now impose sentence.  Pursuant to the

24     United States Supreme Court rulings in United States v.

25     Booker and United States v. Fanfan, the United States

1    Sentencing Commission Guidelines have become advisory.

2         This Court, while not bound to apply those

3    guidelines, has taken them into account along with the

4    sentencing factors identified at 18 United States Code

5    Section 3553(a), which indicates that this Court's

6    sentence should reflect the seriousness of the offense,

7    promote respect for the law, provide just punishment,

8    adequately deter criminal conduct -- I have lost track of

9    what I said here -- protect the public from further crimes

10   by the defendant, and to provide the defendant with any

11   needed correctional, educational or vocational training

12   and medical care or other correctional treatment in the

13   most effective manner.

14        To fashion a sentence that meets these objectives,

15   I have considered the nature and circumstances of this

16   offense, the history and characteristics of this

17   defendant, the kinds of sentences that are available, the

18   sentence that was recommended by the guidelines, the need

19   to avoid any unwarranted sentencing disparities among

20   defendants with similar records found guilty of similar

21   conduct.

22        Now, based on the information contained in all of

23   the documents I have previously identified in this hearing

24   as having been reviewed by me, including the record from

25   the trial in this case and my review of relevant documents

1    and filings in the North Dakota case, and my review of all

2    of the cases identified in a PACER search in which

3    defendant entered an appearance of counsel for clients in

4    federal, criminal or habeas matters.

5         For the reasons stated by this Court previously in

6    this hearing, and in my prior sentencing hearing, the

7    Court makes the following findings concerning the

8    defendant's objections to the presentence report.

9         The defendant's relevant conduct involved more than

10   10 or more victims.  With respect to the amount of the

11   loss, the Court wishes that the Government had provided it

12   with better direct testimonial evidence.  The Court

13   believes that there is sufficient information by which it

14   could easily calculate a reasonable estimate of the loss

15   to exceed $200,000.

16        Based on the fact that the evidence that the Court

17   has reviewed indicates that the defendant charged a

18   minimum of $15,000 for representation in federal court in

19   terms of an appeal or habeas, and according to the PACER

20   search, there are 13 cases in which such an appearance was

21   made.

22        Nonetheless, instead of applying the 10 or 12 point

23   enhancement that this Court believes is sufficiently

24   documented, the Court will apply a conservative estimate

25   based on the discovery provided by the Government to the

1    defendant, which included several FBI reports confirming

2    that one victim's loss was 35,000, another 36,500, and

3    Mr. Stupka's letter indicating that his loss was 20,000,

4    for a total loss of 91,500.

5         The Court rejects the defendant's argument that

6    this loss should be offset by the value of the services he

7    provided because he provided satisfactory legal services

8    to his victims. The Court also finds that the defendant

9    abused a position of trust or used a special skill during

10   the instant offense.

11        The Court finds that with respect to Count 3,

12   although this Court -- that the sentence I impose run

13   concurrent to one another on Counts 1, 2 and 3.  My

14   findings on Count 3 here will be somewhat of an academic

15   exercise.

16        Nonetheless, I find that it is a felony offense for

17   which no guideline has expressly been promulgated.  The

18   most analogous offense guideline is 2J1.2, obstruction of

19   justice, which imposes a base offense level of 14.

20   Because the offense resulted in substantial interference

21   with the administration of justice, the offense level is

22   increased by 3.  Thus, the adjusted offense level for

23   Count 3 is 17, and the multiple count adjustment of 3D1.4

24   are applicable.

25        With respect to Counts 1 and 2, these findings

1    result in an 8-level increase in the base offense level,

2    as opposed to 10-level increase that was in the

3    presentence investigation report, or the amended

4    presentence investigation report.  Pursuant to

5    2B1.1(b)(1)(E), a 2-level enhancement for number of

6    victims pursuant to U.S. Sentencing Guideline

7    2B1.1(b)(2)(A)(i), and a 2-level enhancement for abuse of

8    position of trust or use of special skill pursuant to

9    3B1.3.

10           Now, the Court is also going to note that in this

11   case, based on the number of websites that were operated

12   by this defendant, the Court believes that the 2-level

13   enhancement for mass marketing could also have been

14   applied and should have been applied.  However, rather

15   than continuing this hearing to give notice to the

16   defendant of that enhancement, I will just simply not

17   apply it.

18           With respect to Count 3, these findings would

19   result in a 3-level increase in the base offense level of

20   14 pursuant to 2J1.2(b)(2).  With respect to the

21   calculation of the criminal history category, because the

22   Court has excluded from its calculation of the offense

23   level all matters that were included as relevant conduct

24   in the North Dakota case, for purposes of calculating the

25   defendant's criminal history category in this case, the

1   Court assesses 3 criminal history points for the North

2   Dakota conviction.  Thus, the defendant's criminal history

3   points are 6, which establishes a criminal history

4   category of III.

5        The Court determines that no finding is necessary

6   concerning the remaining objections to the presentence

7   report because the controverted matters either will not be

8   taken into account in imposing sentence or will not affect

9   the sentence.

10       Neither the Government nor the defendant has

11   challenged any other aspect of the presentence report,

12   therefore, the remaining factual statements and guideline

13   applications are adopted without objection as the Court's

14   findings of fact concerning sentencing.

15       The Court finds that with respect to Counts 1 and

16   2, the total offense level is 21, and the defendant's

17   criminal history category is III, which results in an

18   advisory imprisonment range of 46 to 57 months, and a fine

19   range of 7,500 to $75,000.  The supervised release range

20   is 3 to 5 years as to Counts 1 and 2, and 3 years as to --

21   I am sorry, the supervised release range is 3 to 5 years

22   as to Count 1, and 2 to 3 years as to Count 2.

23       With respect to Count 3, the total offense level is

24   17.  The defendant's criminal history category is III,

25   which results in an advisory imprisonment range of 30 to

1    37 months, and fine range of $5,000 to $50,000.  The

2    supervised release range is in the discretion of this

3    Court.

4        The Court does not believe that its decision that

5    5G1.3 is applicable -- strike that.  The Court does not

6    believe that its decision with respect to the

7    non-applicability of Section 5G1.3 in this case is a

8    departure from the sentencing guidelines, especially in

9    light of the fact that the sentencing guidelines are only

10   advisory to this Court.

11       Nonetheless, the Court finds that there is reason

12   and justification to depart or vary from the sentencing

13   guidelines in this case.  I have considered the 3553

14   factors, particularly this defendant's history and

15   characteristics, and noted that virtually all of his

16   convictions involve fraudulent and deceitful conduct which

17   indicates to this Court a high likelihood of recidivism,

18   especially in light of the fact that within a couple of

19   years of being released from prison in the 1990 case,

20   fraud against the Government, this defendant was

21   perpetrating this scheme of fraud.

22       However, because I have determined that this

23   sentence should run consecutively to the sentence

24   defendant is serving in the District of North Dakota, the

25   Court finds that a sentence within the guideline range is

1    sufficient but not greater than necessary to meet the

2    objectives set forth at 18 United States Code Section

3    3553(a), and I will impose a sentence within that range,

4    although I believe there is significant substantiation for

5    an upward departure if I had so been inclined.  And I

6    would have been inclined but for the fact that I found it

7    was to be a consecutive sentence.

8        Therefore, pursuant to Sentencing Reform Act of

9    1984, it is the Judgment of this Court that the defendant,

10   Howard O. Kieffer is hereby committed to the custody of

11   the Bureau of Prisons to be imprisoned for a term of 57

12   months as to Counts 1 and 2, and for a term of 37 months

13   as to Count 3.  The terms of imprisonment in this case are

14   to be served concurrently, however the terms of

15   imprisonment imposed by this Judgment shall run

16   consecutively with the term of imprisonment imposed on

17   defendant in Docket No. 08-cr-0054-PAC, District of North

18   Dakota.

19       Upon release from imprisonment, the defendant shall

20   be placed on supervised release for a term of 5 years.

21   This term consists of terms of 5 years as to Counts 1, 3

22   years as to Count 2, and 3 years as to Count 3, all such

23   terms to run concurrently.  Within 72 hours of release

24   from the custody of the Bureau of Prisons, the defendant

25   shall report in person to the probation office in the

1    district to which the defendant is released.

2         While on supervised release, the defendant shall

3    not commit another federal, state or local crime; shall

4    not possess a firearm as defined in 18 United States Code

5    Section 921; and shall comply with the standard conditions

6    that have been adopted by this Court.

7         The Court waives the mandatory drug testing

8    provisions of 18 United States Code Section 3583(d)

9    because the presentence report indicates a low risk of

10   future substance abuse by this defendant.

11        The defendant shall cooperate in the collection of

12   DNA as directed by the probation officer.  The following

13   special conditions are imposed:  First, the defendant

14   shall not incur new credit charges or open additional

15   lines of credit without the approval of the probation

16   officer unless the defendant is in compliance with the

17   periodic payment obligations imposed pursuant to the

18   Court's judgment and sentence.

19        Second, as directed by the probation officer, the

20   defendant shall apply any moneys received from income tax

21   refunds, lottery winning, inheritances, judgments, and any

22   anticipated or unexpected financial gains to the

23   outstanding court-ordered financial obligations in this

24   case.

25        Third, any unpaid restitution balance upon release

1    from incarceration shall be paid in monthly installment

2    payments during the term of supervised release.  The

3    monthly installment payment will be calculated as at least

4    10 percent of the defendant's gross monthly wages.

5         Fourth, the defendant shall make payment on the

6    restitution obligation that remains unpaid at the

7    commencement of supervised release.  Within 60 days of

8    release from confinement, the defendant shall meet with

9    the probation officer to develop a plan for the payment of

10   restitution.  This plan will be based upon the defendant's

11   income and expenses.  The defendant shall submit to

12   financial monitoring by or at the direction of the

13   probation officer.

14        The defendant shall document all income and

15   compensation generated or received from any source and

16   provide such information to the probation officer as

17   requested.

18        Six, any employment for or business ventures by the

19   defendant must be approved in advance by the probation

20   officer.

21        The defendant shall make restitution to the

22   following victims for whom compensation has not been

23   previously ordered by any court:  Donald Sturgis, $3,519.

24   Victor Souid, $32,000.  Michael Danton, $40,000.  Mark

25   Anthony Roberts, $15,000.  Edwin Stupka, $20,000.  Richard

1        Lynn, $5,000.  Wayne Milton, $36,500.

2              The Government is to provide to the probation

3        department the addresses for each of these victims.

4        Restitution is ordered to be directed to the addresses

5        provided to the Clerk of the Court by the probation

6        officer.

7              Disbursement of restitution payments sent to

8        victims and returned to the Clerk of the Court as unpaid

9        or undeliverable shall be deposited into the Court's

10       registry and disbursed to the remaining victims.  These

11       payments shall be allocated pro rata among all of the

12       victims.

13             The Court finds that the defendant does not have

14       the ability to pay interest, and the Court waives the

15       interest requirements for the restitution.  Because this

16       sentence imposes restitution, it is a condition of

17       supervised release that the defendant pay in accordance

18       with the schedule of payment sheet set forth in the

19       Judgment.

20             The defendant shall pay a special assessment of

21       $300.  The special assessment and restitution obligation

22       are due and payable immediately.  The Court finds that the

23       defendant does not have the ability to pay a fine, so the

24       Court will waive the fine in this case.

25             All right.  Mr. Kieffer, the root of your scheme

1    and your conduct has been pure deception.  You utilized

2    prior admissions to other district courts to gain

3    admission to the District Court of Colorado to represent

4    Ms. Gwen Bergman.  You used your knowledge of the federal

5    court system and the admissions process to take advantage

6    of unsuspecting victims and of the courts.

7            You deceived licensed attorneys whom you had

8    befriended, and utilized those friendships to have those

9    attorneys vouch for your admission into the federal

10   courts.  You took hundreds of thousands of dollars from

11   people who were in a very vulnerable point in their lives,

12   either because they had just been sentenced to many years

13   in prison, or their spouses, parents, siblings had just

14   experienced a loved one being sentenced to many years of

15   imprisonment.

16           Your deceptive and criminal behavior dates back

17   more than 30 years, and it includes several felony

18   convictions for grand theft, forgery, false claims, mail

19   fraud and false statements.  You have also misdemeanor

20   convictions for fraud -- I am sorry, for theft and

21   fraud-related offenses.

22           You have shown a profound disrespect for the Court

23   system based on your continuous false representations

24   which began shortly after you were released from prison in

25   1993, and spanning 15 or more years.

1          I also noted that in the presentence report in the

2     North Dakota case, while you were being prosecuted for

3     falsely holding yourself out as an attorney, you violated

4     your pretrial release conditions by making legal calls to

5     Bureau of Prison inmates, during which calls you acted as

6     the attorney for those inmates.

7          You have a significant history of misleading others

8     and engaging in manipulative and fraudulent conduct.  Your

9     criminal history score as calculated under the United

10    States Sentencing Guidelines, under represents the

11    seriousness of your criminal history and the danger that

12    you present to the public based on your repeated pattern

13    of fraud, deception and taking advantage of others.

14         Pursuant to Booker, Rita, Gall and Kimbrough, my

15    responsibility is to impose a sentence that is sufficient

16    but not greater than necessary to satisfy the statutory

17    purposes of sentencing that I referenced earlier.  It is

18    my responsibility to consider whether the guidelines fail

19    to properly reflect 3553(a) considerations, whether they

20    reflect an unsound judgment, whether they fail to treat

21    your characteristics in a proper way, or whether a

22    different sentence is appropriate.

23         I have conducted the post-Booker three-step

24    sentencing review process set forth by the Tenth Circuit.

25    After carefully reviewing the sentencing guidelines and

1   the Section 3553 factors, I have calculated the applicable

2   guideline range, including a determination that it is

3   appropriate that your sentence be served in this case

4   consecutively to the sentence you are serving in the North

5   Dakota case.

6        Although I believe that there is substantial reason

7   for me to depart upward, I have determined that I will not

8   depart upward or vary, as I had indicated I would do at

9   the last sentencing hearing, because I believe a sentence

10  57 months served consecutively with the sentence you are

11  serving in the North Dakota case is sufficient but no

12  greater than necessary to achieve the statutory purposes

13  of sentencing set forth at 18 United States Code Section

14  3553(a).

15       In particular, to reflect the seriousness of this

16  offense, to provide just punishment for the offense, to

17  promote respect for the law, to afford adequate deterrence

18  to criminal conduct, to specifically deter future criminal

19  conduct by you, and to protect the public from further

20  crimes by you.

21       These factors significantly outweigh any medical

22  issues that you have raised.  A 5-year term of supervised

23  release has been imposed to provide additional deterrence,

24  to allow on for monitoring of your activities in the

25  community, and to hopefully ensure that you will not

1    become involved in further fraudulent conduct.  In

2    addition, that time will allow you to make at least some

3    minimal restitution to your victims.

4         All right.  Counsel, with respect to your motion on

5    Rule 104 to seal the documents, Document Nos. 88 and 103.

6         Mr. Chambers, Document No. 88 is a 22-page

7    document.  Only one paragraph on pages 12 through 13 that

8    would merit redacting, and I am not inclined to redact an

9    entire document because you included one paragraph.  So

10   that will be how I would intend to rule on this.  Do you

11   have any argument you wish to make to me?

12        MR. CHAMBERS:  Well, I can submit a document for

13   the public file that has that paragraph redacted, if that

14   would be acceptable.

15        THE COURT:  All right.  That would be acceptable to

16   the Court.  I will then order that current Document No. 88

17   will be under seal as soon as Mr. Chambers submits a

18   public document which has redacted that one paragraph on

19   pages 12 through 13 which deals with confidential health

20   information.  And that should be redacted with an

21   attachment that will be considered under seal.

22        MR. CHAMBERS:  I am sorry?

23        THE COURT:  So we have one document.  You are to

24   submit a redacted document.  Attach as an attachment to

25   that document the paragraphs that you've removed under

1    seal --

2          MR. CHAMBERS:  Very good.

3          THE COURT:  -- that you removed.  That attachment

4    will remain under seal.  The other document will be a

5    public document.  But that way, anybody in the future goes

6    to that document, and if I have access to it, I will know

7    exactly what has been redacted.

8          MR. CHAMBERS:  Very good.  I understand.

9          THE COURT:  All right.  Counsel, are there any

10   other matters to be brought to this Court's attention?

11         MR. WALZ:  I believe Mr. Kieffer needs to be

12   advised of appellate rights.

13         THE COURT:  Oh, I am sorry, yes, I do need to do

14   that.

15         Mr. Kieffer, you are advised that you have the

16   right to appeal this sentence.  If you desire to appeal, a

17   Notice of Appeal must be filed with the Clerk of Court

18   within 14 days after entry of Judgment or your right to

19   appeal will be lost.  If you are unable to afford an

20   attorney for an appeal, an attorney will be appointed to

21   represent you.  And if you request, the Clerk of the Court

22   will immediately prepare and file a Notice of Appeal on

23   your behalf.

24         Anything further, counsel?

25         MR. CHAMBERS:  Just two things, Your Honor.  During

1    our discussions before the break, where the Court had

2    inquired about the objections we had made, we did not

3    address restitution.  I just want to make sure the

4    Court -- and I am sure the Court did take into

5    consideration my objections, which were primarily, I

6    think, found in Document 88.

7         THE COURT:  Yes.

8         MR. CHAMBERS:  And central among those is the lack

9    of evidence, the failure of proof.  I don't need to make

10   any further record.  But we had not discussed that

11   previously.  So I hope that will be regarded as timely.

12        THE COURT:  Yes.  You had made the objection.  I

13   had considered it.  I did not include all of that

14   information for purposes of calculating the offense level,

15   but I do believe it is appropriate for me to order

16   restitution on those matters.

17        MR. CHAMBERS:  Further, Your Honor, Mr. Kieffer has

18   already been designated, and we would ask that he be

19   returned to the facility where he is designated, which is

20   Duluth, immediately.

21        THE COURT:  I will leave that to the Bureau of

22   Prisons.  I am not willing to make any recommendations on

23   behalf of Mr. Kieffer.

24        MR. CHAMBERS:  Then I think that's it.

25        THE COURT:  All right.  Thank you very much,

1    counsel.  Court will be in recess.

2            (Court is in recess at 10:52 a.m.)

3

4            **R E P O R T E R ' S   C E R T I F I C A T E**

5

6            I, Darlene M. Martinez, Official Certified

7    shorthand Reporter for the United States District Court,

8    District of Colorado, do hereby certify that the foregoing

9    is a true and accurate transcript of the proceedings had

10   as taken stenographically by me at the time and place

11   aforementioned.

12

13

14

15           Dated this 20th day of September, 2010.

16

17

18

19           _____

20           s/Darlene M. Martinez

21           RMR, CRR

22

23

24

25